JACKSON NATIONAL LIFE INSUR-
ANCE COMPANY and Benchmark
Holdings, Inc., Plaintiffs,

v.

Michael T. KENNEDY, Radnor Hold-
ings Corporation, successor to Bench-
mark Corporation of Delaware, Winc-
up Holdings, Inc., WinCup Holdings,
L.P., Fort James Corporation, succes-
sor to James River Corporation of
Virginia, and Fort James Operating
Company, Inc., successor to James
River Paper Company, Inc., Defen-
dants.

C.A. No. 16472.

Court of Chancery of Delaware,
New Castle County.

Submitted: Feb. 26, 1999.
Decided: July 15, 1999.

Jay W. Eisenhofer and Cynthia A. Calder of Grant & Eisenhofer, Wilmington, Delaware; William I. Goldberg, J. Michael Williams, and Judith M. Hudson of Holleb & Coff, Chicago, Illinois, of counsel, for Plaintiffs.

P. Clarkson Collins, Jr. and Joseph C. Schoell of Morris, James, Hitchens & Williams, Wilmington, Delaware; James H. Walsh and H. Carter Redd of McGuire, Woods, Battle & Boothe, Richmond, Virginia, of counsel, for Defendants.

## *OPINION*

STEELE, Vice Chancellor.

### I. ISSUES PRESENTED

Benchmark Holdings Inc. ("Benchmark Holdings") and Jackson National Life Insurance Co. ("Jackson National"), a preferred stockholder of Benchmark Holdings, brought an action against the former president and sole director of Benchmark Holdings, Michael T. Kennedy, and a number of corporate entities associated with the acquisition of Benchmark Holdings' assets by Fort James Operating Corp. Fort James Corp. and Fort James Operating Corp. have filed a 12(b)(6) motion to dismiss Count IX of the complaint, as well as that portion of Count X pertaining to the movants. At issue is whether the complaint properly states a claim against Fort James Corp. and Fort James Operating Corp. for aiding and abetting Kennedy in his alleged breaches of fiduciary duty, and for unjust enrichment and imposition of a constructive trust.

Specifically, this motion raises the issue of whether the complaint alleges sufficient-

ly the following: (1) that Kennedy owed fiduciary duties of loyalty and disclosure to the preferred stockholders; (2) in the event that Kennedy owed those fiduciary duties, that he breached them; and (3) that Fort James knowingly participated in Kennedy's breaches of fiduciary duties, if there were any.

Because the complaint alleges that Kennedy breached a fiduciary duty of disclosure and candor by failing to notify Jackson National of a transaction which it believes constituted a "Voting Event" as defined by the Certificate of Designation (the "Certificate") when Kennedy intentionally omitted material facts in correspondence between him and Jackson National's investment advisors and nothing more, I dismiss the portion of the aiding and abetting claim against Fort James based on the alleged breach of a fiduciary duty of disclosure. This claim may implicate contractual rights defined by the Certificate. It neither flows, however, from an obligation to communicate with all stockholders nor does the correspondence complained about in the claim seek stockholder action.

On the other hand, I conclude that Plaintiffs' claim arising out of alleged intentionally false and misleading communications to Jackson National's investment advisors could, when pleaded accordingly, form the basis of a claim for breach of a fiduciary duty of loyalty. The gravamen of this holding is that when the directors of a Delaware corporation voluntarily communicate with stockholders, they must do so with honesty and fairness, recognizing that they owe a duty of loyalty, regardless of the stockholders' status as preferred or common, and regardless of the absence of a request for action required pursuant to a statute, the corporation's certificate of incorporation or any bylaw provision.

In addition, because the complaint alleges that Kennedy was Benchmark Holdings' sole director, that Kennedy unfairly allocated the proceeds from the sale of assets to the detriment of Benchmark Holdings and Jackson National and to Kennedy's benefit, and that Fort James financially induced Kennedy to misallocate the proceeds or, at the very least knew of Kennedy's misallocation of the proceeds, I conclude that the complaint pleads sufficiently that Kennedy owed a fiduciary duty of loyalty to Benchmark Holdings and Jackson National, that Kennedy breached that duty of loyalty, and that Fort James knowingly participated in Kennedy's breach of his fiduciary duty of loyalty.

## II. BACKGROUND

### A. The Parties

Plaintiff Benchmark Holdings is a Delaware corporation which until November 6, 1995 manufactured disposable eating and drinking ware (plastic plates, silverware, cups and containers). Plaintiff Jackson National is a preferred stockholder of Benchmark Holdings. Defendant WinCup Holdings, Inc. ("WinCup Holdings") is a Delaware corporation which, like Benchmark Holdings, manufactured and sold disposable eating and drinking ware (plastic plates, silverware and cups). WinCup Holdings also manufactured styrofoam cups and containers. Defendant Radnor Holdings Corp., the successor to Benchmark Corp. of Delaware ("Benchmark Corp."), owns all of the common stock of both Benchmark Holdings and WinCup Holdings. At the time of the disputed transaction in this action, Defendant Kennedy owned approximately 90 percent of the voting stock of Benchmark Corp., and was president and sole director of Benchmark Holdings, Benchmark Corp. and WinCup Holdings. Defendant Fort James Corp. is the successor to James River Corp. of Virginia, and Defendant Fort James Operating Co., Inc., a wholly-owned subsidiary of Fort James Corp., is the successor to James River Paper Co., Inc. (these entities are referred to collectively as "Fort James"). On or about November 6, 1995, Fort James acquired the plastic tableware businesses of Benchmark Hold-

ings and WinCup Holdings. Defendant WinCup Holdings, L.P. ("the WinCup Partnership"), is a Delaware limited partnership that WinCup Holdings and Fort James formed following Fort James' purchase of Benchmark Holdings' and WinCup Holdings' plastic tableware businesses. Both WinCup Holdings and Fort James contributed their styrofoam cup and container businesses to the WinCup Partnership.

### B. Jackson National's Preferred Stock in Benchmark Holdings

Jackson National acquired a preferred equity position in Benchmark Holdings pursuant to the Certificate, dated May 24, 1991.[1] The Certificate provides that the Benchmark Holdings board of directors "does hereby fix and determine the relative rights, powers and preferences of the Series A Preferred Stock." Exhibit A, Section II.A of the Certificate states that "[e]xcept to the extent otherwise expressly provided by (i) the Delaware General Corporation Law, as amended, and (ii) Section II.B hereof, the holders of shares of Series A Preferred Stock shall not have any right to vote on any matter submitted to the stockholders of the Corporation for a vote." Exhibit A, Section II.B of the Certificate provides that the preferred stockholders could appoint a majority of the Benchmark Holdings board of directors upon the occurrence of any of the following (a "Voting Event"):[2]

(a) the Corporation's principal bank lender shall have furnished a notice to the Corporation declaring all or substantially all (which, for this purpose, shall mean 95% thereof) obligations owed by the Corporation to such lender immediately due and payable and the holders of shares of Series A Preferred Stock shall have made a $2,000,000 cash equity contribution to the Corporation on or after the date of such notice in consideration for the purchase of 200,000,000 shares of fully paid and nonassessable Class P Nonvoting Common Stock;

(b) the Corporation shall have ceased its business operations; or

(c) the Corporation applies for, consents to, or acquiesces in, the appointment of a trustee, receiver or other custodian for the Corporation, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent, or acquiescence, a trustee, receiver or other custodian is appointed for the Corporation and such appointment is not controverted by appropriate proceedings diligently pursued within thirty (30) days and is not discharged or dismissed within forty-five (45) days; or any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is instituted by or against the Corporation and is not controverted by appropriate proceedings diligently pursued within thirty (30) days and is not dismissed within forty-five (45) days.

### C. The Disputed Transaction

The relevant details of the disputed transaction in this action, as alleged by Plaintiffs, are as follows. In the fall of 1994, Kennedy approached the investment banking firm Alex. Brown & Sons ("Alex.

1. Benchmark Holdings issued 3,800,000 shares of Series A Convertible Preferred Stock, of which Jackson National received 2,959,820 shares. Green Capital Investors, L.P. ("Green Capital"), which was 29.67 percent owned by Jackson National, received the balance of the preferred shares. These shares entitled Jackson National and Green Capital to a preferential liquidation payment of not less than $2.6316 per share before any payments to common stockholders.

2. By agreement between Jackson National and Green Capital, in the case of such a Voting Event, Green Capital would vote its shares as directed by Jackson National.

Brown") to help sell all of the assets of Benchmark Holdings, as well as the disposable plastic tableware assets of WinCup Holdings. In a February 1995 report, Alex. Brown valued these assets, which it marketed as the Winkler Products Co. ("Winkler Products"), at between $30–$90 million, and valued the Benchmark Holdings preferred stock at $7.5 million.

In May 1995, Fort James received and reviewed a sales memorandum prepared by Alex. Brown, as well as supplemental financial information provided by Alex. Brown about Winkler Products. By letter dated June 13, 1995, Fort James expressed to Alex. Brown a preliminary non-binding indication of interest in acquiring those assets contingent upon, among other things, verification of the financial information provided by Alex. Brown, and review by Fort James of Benchmark Holdings' and WinCup Holdings' management reports and financial statements. Several later letter agreements set out the basic terms under which Fort James would be willing to acquire the Winkler Products assets. Among these terms were Fort James' insistence upon complete access to all of the books and records of Benchmark Holdings and WinCup Holdings. By letter dated August 15, 1995, Benchmark Holdings entered into an agreement with Fort James for the purchase and sale of Winkler Products for $55 million. Kennedy executed this agreement as Benchmark Holdings' chairman and chief executive officer. WinCup Holdings did not sign this agreement.

On August 17, 1995, Fort James and WinCup Holdings entered into a letter agreement whereby the two companies would form the WinCup Partnership, into which they would fold their respective styrofoam cup and container businesses. The agreement contemplated the eventual acquisition by Benchmark Corp. (a Kennedy-controlled entity) of Fort James' interest in the WinCup Partnership. Kennedy executed this letter of intent in his capacity as chairman and chief executive officer of WinCup Holdings. Fort James negotiated the deal on its own behalf. On October 31, 1995, Fort James and WinCup Holdings entered into an agreement implementing the WinCup Partnership (the "WinCup Partnership Agreement"). Under this agreement, Fort James' purchase of the disposable plastic tableware businesses of Benchmark Holdings and WinCup Holdings (i.e. Winkler Products), as contemplated by the August 15, 1995 agreement, was a condition precedent to its implementation.

In November 1995, Benchmark Holdings sold its operating assets to Fort James and thereafter ceased business operations. Benchmark Holdings transferred its accounts receivable and trade payables to a Liquidation Trust, with the proceeds of the receivables earmarked for the payment of Benchmark Holdings' trade creditors. WinCup Holdings also sold its disposable plastic tableware assets to Fort James. The balance of WinCup Holdings' business, its styrofoam cup and container operations, was transferred to the WinCup Partnership.

Fort James paid an aggregate of $53.8 million in cash for the disposable plastic tableware businesses of Benchmark Holdings and WinCup Holdings, which received $41.3 million and $10 million respectively. Key management employees received $2.5 million in the form of non-competition agreements. Kennedy personally received $2 million. Benchmark Holdings paid approximately $39 million of the cash it received to Continental Bank, N.A., n/k/a Bank of America Illinois ("the Bank"), which used part of these funds to retire Benchmark Holdings' liabilities to the Bank, as well as a substantial amount of WinCup Holdings' obligations to the Bank. The Bank also used these funds to cause the release both of personal guaranties executed by Kennedy in favor of the Bank, and of cross-collateral security agreements executed by WinCup Holdings with the Bank. The remaining $2.3 million was used to pay professional fees and creditors.

Jackson National, a preferred stockholder, received nothing.

The sale of the plastic tableware business to Fort James, and the later reduction of WinCup Holdings's obligations to the Bank, enabled WinCup Holdings to become the general partner of the WinCup Partnership. After the transfer of its remaining assets pursuant to the WinCup Partnership Agreement, WinCup Holdings held a 55 percent controlling interest in the WinCup Partnership. Fort James was allocated the remaining 45 percent interest, and became the sole limited partner of the WinCup Partnership. In December 1996, the Radnor Holdings Corp. (Benchmark Corp.'s successor) purchased Fort James' 45 percent interest in the WinCup Partnership, as contemplated by the WinCup Partnership Agreement, for approximately $31.9 million.

A single law firm represented Kennedy, Benchmark Holdings, Benchmark Corp. and WinCup Holdings in these transactions. At the time of the transactions, Kennedy owned approximately 90 percent of the voting stock of Radnor Holdings Corp., and was its president and sole director. When the complaint in this case was filed, Kennedy was still president and a director of Radnor Holdings Corp. Through its stake in the WinCup Partnership, Radnor Holdings Corp. has become the second largest U.S. manufacturer of disposable styrofoam cups and containers, with annual sales in excess of $175 million. In addition, the Bank has discharged its lien on all of Kennedy's collateral, its liens on WinCup Holdings' property, and Kennedy's personal guaranties to the Bank. Jackson National had no representation in the transaction, and claims it was wrongfully excluded from any interest in the WinCup Partnership.

Plaintiffs contend that Defendants essentially exchanged Benchmark Holdings' plastic tableware business for Fort James' styrofoam cup and container business through transactions in which Kennedy, Benchmark Corp., WinCup Holdings, the WinCup Partnership and Fort James all received millions of dollars in cash and other benefits, while Benchmark Holdings itself was stripped of its assets and Jackson National was left holding preferred stock rendered worthless in a corporate shell.

### D. Kennedy's Alleged "Misdisclosures"

In addition to the allegations that Jackson National had no foreknowledge of the sale of Benchmark Holdings' assets to Fort James, Plaintiffs allege that Kennedy and those working with him affirmatively concealed the transaction from Jackson National. In particular, Plaintiffs claim that Michael V. Valenza, Vice President of Finance for WinCup Holdings, sent two letters to PPM America, Jackson National's investment advisors, both of which failed to mention the fact that Benchmark Holdings' assets would soon be, or had just been, sold to Fort James.

The first letter, dated October 26, 1995, preceded by five days the implementation of the WinCup Partnership Agreement, which Fort James and WinCup Holdings had allegedly negotiated months before. Valenza enclosed in this letter the December 1994 financial statements for Benchmark Holdings, but omitted any reference to the fact that Benchmark Holdings' assets were to be sold less than two weeks later. A copy of this letter was sent to Kennedy. The second letter, dated November 22, 1995, with a copy also sent to Kennedy, contained the September 1995 financial statements for Benchmark Holdings, but also failed to mention either the sale of Benchmark Holdings assets, which had occurred two weeks earlier, or the fact that Benchmark Holdings had ceased business operations.

Plaintiffs allege that Valenza, like Kennedy, knew about and participated in the sale of Benchmark Holdings to Fort James, and that these letters, copies of which were sent to Kennedy, intentionally omitted material facts related to the trans-

action, such as that Benchmark Holdings intended to sell or had sold all of its assets and would cease business operations, and that Kennedy and Fort James had agreed to the formation of the WinCup Partnership and Kennedy's buyout of Fort James' interest in it.

## III. THE PARTIES' CONTENTIONS

The complaint alleges a variety of claims against all those defendants associated with Kennedy, including breach of fiduciary duties of loyalty and disclosure and candor, intentional interference with contractual relations, usurpation of a corporate opportunity, fraud, and aiding and abetting a breach of fiduciary duties. The complaint further sets forth claims for aiding and abetting breaches of fiduciary duties against Fort James. Against all defendants, the complaint claims unjust enrichment and pleads for imposition of a constructive trust.

Fort James' motion forces the Court to focus on the underlying claims that Kennedy breached fiduciary duties owed to the Plaintiffs and that absent well pleaded claims of breach of fiduciary duty that there can be no aiding and abetting claim against Fort James and, therefore, no appropriate relief may be granted.

Plaintiffs allege these causes of action exist by virtue of the fact that Jackson National had no knowledge of the sale of Benchmark Holdings' assets to Fort James, nor was Jackson National informed of the transaction by any of the defendants either before or contemporaneously with its occurrence. Jackson National claims that the Kennedy entities denied it a corporate opportunity, and in concealing the transaction prevented Jackson National both from exercising its right to elect a

majority of the directors on the Benchmark Holdings board, and from sharing in the proceeds from the sale of the Benchmark Holdings assets to Fort James. All of these rights Jackson National claims exist by virtue of its position as preferred stockholder of Benchmark Holdings. Plaintiffs allege also that Fort James knowingly participated in Kennedy's concealment of the transaction from Jackson National, and benefited from the diversion of money from Benchmark Holdings and Jackson National to Kennedy and Fort James.

Fort James moves to dismiss the aiding and abetting a breach of fiduciary duty and unjust enrichment counts (IX and X) brought against it pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Fort James argues that Plaintiffs' allegations against Kennedy must be determined by contract rather than fiduciary duty principles, and as such the complaint fails to allege a fiduciary duty that Kennedy breached during Fort James' involvement. Accordingly, Fort James argues that Plaintiffs' attempt to plead that Fort James knowingly participated in Kennedy's alleged breach of fiduciary duty must, in the absence of such a duty, also fail.

## IV. DISCUSSION

### A. Legal Standard

 The appropriate standard on a motion to dismiss pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim is rigorous.[3] A complaint will be dismissed only if "it appears to a reasonable degree of certainty the plaintiff would not be entitled to relief under any set of facts which could be proved in support of his claim."[4] This Court assumes the truth

---

**3.** *Rosan v. Chicago Milwaukee Corp.*, Del. Ch., C.A. No. 10526, 1990 WL 13482, mem. op. at 1, Chandler, V.C. (Feb. 6, 1990).

**4.** *James River–Pennington, Inc. v. CRSS Capital, Inc.*, Del. Ch ., C.A. No. 13870, 1995 WL 106554, mem. op. at 10, Steele, V.C. (Mar. 6,

1995) (citing *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1104 (1985)); *In re USACafes, L.P. Litig.*, Del. Ch., 600 A.2d 43, 47 (1991).

of all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the light most favorable to the plaintiff.[5] Mere conclusory allegations, however, will not be accepted as true.[6]

## B. Aiding and Abetting a Breach of Fiduciary Duties

■ Count IX claims that Fort James aided and abetted breaches of fiduciary duties owed by Kennedy to Benchmark Holdings and to Jackson National as a preferred stockholder in Benchmark Holdings. Any such claims require that the following elements be pleaded with sufficient supporting facts in order to survive a motion to dismiss: "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary."[7]

### 1. The Existence of A Fiduciary Duty of Loyalty

Plaintiffs allege that Kennedy owed a fiduciary duty of loyalty to Benchmark Holdings and fiduciary duties of loyalty and disclosure and candor to Jackson National, all arising from Kennedy's position as president and sole director of Benchmark Holdings.

### (a) To Benchmark Holdings

■ It is well established that the directors of a Delaware corporation have a fiduciary relationship with the corporation they serve and its stockholders.[8] This fiduciary obligation has been characterized by the Supreme Court as a "triad": due care, good faith and loyalty.[9] With these principles in mind, it is clear that Plaintiffs in Count II of their complaint plead facts sufficient, if proved, to establish that Kennedy owed fiduciary duties to plaintiff Benchmark Holdings by virtue of his position as that corporation's president and sole director.

### (b) To Jackson National

■ To decide the issue of whether Kennedy owed Jackson National similar fiduciary duties, however, requires an inquiry into Jackson National's relationship to Kennedy as a preferred stockholder in Benchmark Holdings. The rights of preferred stockholders are in many respects both equitable and contractual. The relationship between a corporation and its preferred stockholders is "primarily . . . contractual in nature," involving "rights and obligations created contractually by the certificate of designation."[10] On the other hand, fiduciary duties as well may be owed to preferred stockholders in limited circumstances. A corporation's directors "are fiduciaries for the [p]referred stockholders, whose interests they have a duty to safeguard, consistent with the fiduciary duties owed by those directors to [the corporation's] other shareholders and to [the corporation] itself."[11] Whether a given claim asserted by preferred stockholders is governed by contract or fiduciary duty

5. *Id.* at 9–10 (citing *Grobow v. Perot,* Del. Supr., 539 A.2d 180, 187 n. 6 (1998)).

6. *Id.* at 10.

7. *Nufarm v. RAM Research,* Del. Ch., C.A. No. 16179, 1998 WL 668648, ltr. op. at 11, Steele, V.C. (Sept. 15, 1998) (quoting *Nebenzahl v. Miller,* Del. Ch., C.A. No. 13206, 1996 WL 494913, mem. op. at 16–17, Steele, V.C. (Aug. 26, 1996, corrected, Aug. 29, 1996)).

8. *Arnold v. Society for Sav. Bancorp, Inc.,* Del. Supr., 678 A.2d 533, 539 (1996).

9. *Malone v. Brincat,* Del.Supr., 722 A.2d 5, 10 (1998) ("[This] triparte fiduciary duty does not operate intermittently but is the constant compass by which all director actions for the corporation and interactions with its shareholders must be guided") (citations omitted).

10. *HB Korenvaes Investments, L.P. v. Marriott Corp.,* Del. Ch., C.A. No. 12922, 1993 WL 205040, mem. op. at 9, Allen, C. (June 9, 1993).

11. *Eisenberg v. Chicago Milwaukee Corp.,* Del. Ch., 537 A.2d 1051, 1062 (1987).

principles, then, depends on whether the dispute arises from rights and obligations created by contract or from "a right or obligation that is not by virtue of a preference but is shared equally with the common." [12]

Delaware courts have not hesitated to state that a fiduciary duty of loyalty is one such right shared equally between the common and preferred stockholders. For example, in *Jedwab v. MGM Grand Hotels, Inc.*,[13] the plaintiff alleged that MGM's directors breached their fiduciary duty of loyalty to the preferred stockholders in negotiating the terms of a merger. The directors argued that since the plaintiff was a preferred stockholder, their duties to the plaintiff were contractual only. The Court rejected this argument, noting the directors' "failure to distinguish between 'preferential' rights (and special limitations) on the one hand and rights associated with all stock on the other." [14] While the Court in *Jedwab* denied the plaintiff's request for a preliminary injunction, it explicitly recognized that the plaintiff's claims to a fair allocation of the merger proceeds "fairly implicate fiduciary duties and ought not be evaluated wholly from the point of view of the contractual terms of the preferred stock designations." [15]

In this case, the Plaintiffs claim that Kennedy breached his fiduciary duty of loyalty to Jackson National by unfairly allocating the proceeds from the sale of Benchmark Holdings' assets to Fort James. As in *Jedwab*, this claim implicates the right to a fair allocation of proceeds, albeit proceeds from a sale of assets as opposed to a merger. As this Court explained in *Jedwab*, the right to a fair allocation of proceeds is one shared by the common and preferred stockholders and is a right that implicates the fiduciary duty of loyalty. Plaintiffs, therefore, have sufficiently pleaded that Kennedy owed Jackson National a fiduciary duty of loyalty.

### 2. The Plaintiffs Then Plead the Fiduciary Duty of Disclosure and Candor as a Distinctive, Separately Owed Fiduciary Duty

Plaintiffs' allegations in Count III that Kennedy breached a fiduciary duty of disclosure and candor, both by failing to notify Jackson National of a transaction which Plaintiffs claim constituted a Voting Event under the Certificate, and by intentionally omitting facts material to Jackson National's rights as a preferred stockholder in connection with the correspondence between Kennedy entities and Jackson National's investment advisors, fall within separate categories. The former claim, for failure to notify Jackson National of circumstances which Jackson National may assert to be a Voting Event implicates those rights defined by the Certificate as opposed to those that may be defined by fiduciary duty principles. The latter claim of intentional omission of material facts under circumstances that could substantially affect the preferred's rights as stockholder correctly implicates a fiduciary duty of loyalty which Plaintiffs incorrectly characterize in their complaint as a duty of disclosure.

Jackson National's right to elect a majority of Benchmark Holdings' directors upon the occurrence of a Voting Event is one contained in the Certificate and the circumstances that may cause that right to come into play must be interpreted pursuant to the Certificate. It is not a right shared with Benchmark Holdings' common stockholders. Though communicating facts which Jackson National might con-

---

12. *Moore Business Forms, Inc. v. Cordant Holdings Corp.*, Del. Ch. C.A. No. 13911, 1995 WL 662685, mem. op. at 6, Jacobs, V.C. (Nov. 2, 1995) (citation omitted).

13. Del. Ch., 509 A.2d 584 (1986).

14. *Jedwab v. MGM Grand Hotels, Inc.*, Del. Ch., 509 A.2d at 593.

15. *Id.* at 594.

strue to be such an alleged Voting Event could arguably have triggered Jackson National's right to appoint a majority of Benchmarks' directors and then enable Jackson National to prevent the sale of Benchmark Holdings' assets to Fort James on the terms of the disputed transaction, that right is by virtue of a preference not shared equally with the common, and thus is governed by contract principles. Any obligation that Kennedy notify Jackson National of the occurrence of a Voting Event is one that, if it exists, arises under the Certificate.

 While it is true that the directors of a Delaware corporation owe a fiduciary "duty of disclosure" to its stockholders when they seek stockholder action,[16] Jackson National did not have the right to participate in any stockholder action surrounding the disputed transaction and neither Kennedy nor his controlled entities had any *obligation* arising out of a fiduciary relationship to inform Jackson National of circumstances that might arguably constitute a Voting Event. Since neither the Delaware General Corporation Law nor Section II.B of the Certificate expressly provided Jackson National with the right to vote on Benchmark Holdings' sale of assets to Fort James, Kennedy had no fiduciary obligation to disclose that transaction to Jackson National.[17]

The occurrence of a Voting Event triggering Jackson National's right under the Certificate to appoint a majority of Benchmark Holdings' directors cannot be analogized to the situation in which the directors of a Delaware corporation impli-

cate the duty of disclosure by submitting a request for action to its stockholders. Jackson National's contract rights exist independent of any affirmative request by Benchmark Holdings' directors. These contractual rights are in no way dependent upon, nor do they involve, the Benchmark Holdings incumbent directors requesting that either the preferred or common stockholders take a specific action. While it is true that the preferred stockholders, by whatever mechanism they agree upon among themselves, which could include a vote, will be in the position to appoint directors to the Benchmark Holdings board, that is a procedure that need not involve, and it is most unlikely that it would involve, initiative or input from Benchmark Holdings' incumbent directors.

 On the other hand, Plaintiffs' separate assertion in Count III that Kennedy breached a duty of disclosure and candor by intentionally omitting to state material facts in connection with the letters from Valenza to PPM America may rightly implicate a fiduciary duty, although not the "duty of disclosure" as the term has somewhat imprecisely come to be known. As the Supreme Court recently articulated in *Malone v. Brincat,* whenever the directors of a Delaware corporation communicate publicly or directly with stockholders about the corporation's affairs, with or without a request for stockholder action, the stockholders are entitled to rely on the directors to discharge their fiduciary duty to exercise due care, good faith and loyalty.[18] The duty of disclosure

---

**16.** *See, e.g., Arnold v. Society for Sav. Bancorp, Inc.,* Del.Supr., 650 A.2d 1270, 1277 (1994) (requiring directors "to disclose fully and fairly all material information within the board's control when it seeks shareholder action"). *Id.* (citations omitted).

**17.** I note that while Section II.B of the Certificate grants Jackson National the right to appoint a majority of Benchmark Holdings' directors upon the occurrence of a Voting Event, it does not grant, upon the occurrence of a Voting Event, Jackson National the right

to vote on any matter submitted to Benchmark Holdings' common stockholders for a vote.

**18.** *Malone v. Brincat,* Del.Supr., 722 A.2d at 10. I leave it to the Supreme Court and to the academic community to distinguish the fiduciary duties of loyalty and "good faith". I think it sufficient for the purposes of this 12(b)(6) motion to limit the discussion to the traditional fiduciary duty of loyalty.

is merely a specific application of the more general fiduciary duty of loyalty that applies only in the setting of a transaction or other corporate event that is being presented to the stockholders for action.[19]

In *Malone,* the complaint alleged that the director defendants intentionally overstated the financial condition of Mercury Finance Company on repeated occasions throughout a four-year period in disclosures to Mercury's stockholders. The plaintiffs in that case brought an action for breach of fiduciary duty of disclosure based on those communications. The *Malone* Court held that even in the absence of a request for stockholder action, directors who deliberately misinform stockholders through the dissemination of false information, either directly or through a public statement, may violate their fiduciary duty of loyalty.[20] In doing so, the Court made it clear, however, that a complaint which bases a duty of disclosure cause of action on such a violation, occurring without a request for stockholder action, does not properly state a claim. Rather, the complaint must plead the claim as a breach of fiduciary duty of loyalty.[21] I recognize that the facts presented in *Malone* caused that Court to focus on the violation of a fiduciary duty of loyalty arising from a director's dissemination of false information in the absence of a request for stock-

holder action. However, it follows from the Court's reasoning that one who pleads that directors deliberately omitted information from a communication with preferred stockholders under circumstances that suggest an intent to mislead the stockholders has set forth a violation of the fiduciary duty of loyalty owed to those preferred which the preferred share equally with common stockholders.[22]

Although it is somewhat unclear from *Malone,* I doubt that the Supreme Court will adopt a materiality standard to scrutinize intentionally deceptive communications where, as here, no stockholder action is sought, and it will often be difficult to conclude as to what the misleading communication could be "material". It should, therefore, be sufficient to plead that a reasonably prudent preferred stockholder would have found those omissions asserted here to be important to its consideration of its rights under the Certificate and that the communicating director or directors could not have reasonably concluded otherwise. Here, just as in *Malone,* where the directors did not seek stockholder action but were nonetheless alleged to have deliberately issued an intentionally false communication to the stockholders, "there is a violation of fiduciary duty. That violation may result in a derivative claim on behalf

**19.** *Id.* A board of directors seeking stockholder approval of a specific corporate action must disclose *all* material facts relating to the requested action so that stockholders can make an informed decision. *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773 (1993) (emphasis added).

**20.** *Malone v. Brincat,* 722 A.2d at 14.

**21.** *Id.* at 10 ("The issue in this case is not whether Mercury's directors breached their duty of disclosure. It is whether they breached their more general fiduciary duty of loyalty and good faith by knowingly disseminating to the stockholders false information about the financial condition of the company").

**22.** According to the case law related to disclosure in a stockholder action setting, the facts misstated or omitted are analyzed according to a "materiality" standard:

... a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.
*Zirn v. VLI Corp.,* Del.Supr., 621 A.2d at 779 (quoting *TSC Indus. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). This materiality standard, though not explicitly an element of a breach of fiduciary duty of loyalty claim based on an intentionally deceptive omission can be helpful in determining the types of false statements which might give rise to a breach of duty of loyalty claim.

of the corporation or a cause of action for damages." [23] In this case, the complaint *does allege* that Kennedy intentionally omitted *material* facts in the October 26 and November 2, 1995 letters from Valenza, Vice President of Finance for WinCup Holdings, to PPM America, the investment advisors to Jackson National. These letters contained the December 1994, and September 1995 financial statements of Benchmark Holdings, respectively, but neglected to mention the impending sale of Benchmark Holdings' assets to Fort James, a sale which would deprive Jackson National of a corporate opportunity and render its preferred stock worthless. It is without doubt that this omitted information, in the context of communications regarding Benchmark Holdings' financial condition, would likely, at a minimum, have assumed actual significance in Jackson National's approach to the exercise of its perceived contractual rights.

 As a result, while I conclude that Kennedy had no obligation to inform Jackson National of a Voting Event because he requested no stockholder action and no duty of disclosure is therefore implicated, I must hold that Plaintiffs' claim arising out of Valenza's alleged intentionally false and misleading communications to Jackson National's investment advisors, copies of which were sent to Kennedy, could, when pleaded accordingly, form the basis of a claim for breach of a fiduciary duty of loyalty. It necessarily follows from *Malone* that when directors communicate with stockholders, they must recognize their duty of loyalty do so with honesty and fairness, regardless of the stockholders' status as preferred or common, and regardless of the absence of a request for action required pursuant to a statute, the corporation's certificate of incorporation or any bylaw provision.

Thus, the portion of Plaintiffs' claim for aiding and abetting a breach of fiduciary duty that is based on an alleged duty of disclosure that Kennedy owed to Plaintiffs is dismissed without prejudice. Plaintiffs, who have sufficiently pleaded the claim and supporting facts that Kennedy owed Jackson National a fiduciary duty of loyalty, but have failed to establish the existence of a similar fiduciary duty of disclosure as a matter of law, shall have the opportunity to replead to assert an appropriate cause of action based upon a breach of the duty of loyalty arising from Kennedy's voluntary and allegedly intentionally deceptive communications with Jackson National.

### 3. Kennedy's Actions While a Self-Interested Director

Plaintiffs allege that Kennedy breached his fiduciary duty of loyalty to Benchmark Holdings and Jackson National by effectuating the sale of Benchmark Holdings' assets to Fort James while benefiting personally at the expense of Jackson National and Benchmark Holdings. Paragraphs 67 and 68 of the complaint, contained within Count I, allege that Kennedy acted without arm's-length bargaining, without consulting Jackson National either before or during the transaction, and while Jackson National as a preferred stockholder had no legal representation and received nothing from the transaction. Such a self-interested transaction, the complaint alleges, was fundamentally unfair to Jackson National.

 It is well established that a director of a Delaware corporation breaches his fiduciary duty to the corporation and its stockholders if the director stands on both sides of a transaction but is unable to demonstrate the "entire fairness" of that transaction,[24] as defined in *Weinberger v.*

---

**23.** *Malone* at 22.

**24.** The danger that a self-interested controlling stockholder will act unfairly in a transaction where he stands on both sides precludes use of the business judgment rule, and re-

quires proof that the transaction is fair to minority stockholders. *See Kahn v. Tremont Corp.*, Del.Supr., 694 A.2d 422, 428 (1997); *Rosenblatt v. Getty Oil Co.*, Del.Supr. 493 A.2d 929, 937 (1985). The burden of proving the

*UOP Inc.,*[25] when the transaction is challenged by the corporation's stockholders. While the *Weinberger* test originally applied in the setting of a dispute between majority and minority common stockholders, this Court in *In re FLS Shareholders Litigation* recognized that in allocating the consideration from a merger, the directors of a Delaware corporation owe fiduciary duties to both common and preferred stockholders, and are obligated to treat the preferred stockholders fairly.[26] In rejecting a proposed settlement in that action, the Court found that the absence of an independent agent negotiating on behalf of the preferred stockholders and the presence of only the "relatively weak" procedural protection of an investment banker's *ex post* opinion that the allocation was fair, created a substantial issue that was fairly litigable.[27] As in *FLS*, Plaintiffs here claim that the disputed transaction lacked procedural safeguards to establish its fairness to the preferred stockholders.[28] While Defendants may very well meet their burden later in this litigation, on this motion I conclude that Fort James has pleaded sufficiently that the transaction was structured unfairly toward the preferred stockholders, and that Kennedy breached a fiduciary duty of loyalty that he owed to Benchmark Holdings and Jackson National.[29]

### 4. Non–Fiduciary's Knowing Participation in the Breaches

There remains the question of whether the complaint alleges facts sufficient to meet the required showing that the non-fiduciary defendant knowingly participated in the breaches of fiduciary duty. A claim of knowing participation need not be pleaded with particularity.

> "[the] standard is, of course, a somewhat opaque one that, unless procedures are employed that are sufficient in themselves to give reasonable assurance of fairness, may require a reviewing agency to make a highly specific inquiry of the company and the transaction." *Id.* at 9.

---

fairness of the transaction falls upon the parties who have entered into the transaction. *Cinerama, Inc. v. Technicolor, Inc.,* Del.Supr., 663 A.2d 1156, 1162 (1995).

**25.** Del.Supr., 457 A.2d 701 (1983). The Court summarized the test as follows:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.

> *Weinberger v. UOP Inc.,* 457 A.2d at 711 (citations omitted).

**26.** *In re FLS Holdings, Inc. Shareholders Litig.,* Del. Ch., C.A. No. 12623, 1993 WL 104562, mem. op. at 8, Allen, C. (Apr. 2, 1993), *aff'd sub nom. Sullivan Money Management, Inc. v. FLS Holdings, Inc.,* Del.Supr., 628 A.2d 84 (unpublished opinion, text available at 1993 WL 245341) (June 18, 1993) (citations omitted). The Court noted that

**27.** *Id.* at 9.

**28.** *See supra* p. 390.

**29.** Having previously held that Kennedy did not owe a fiduciary duty of disclosure and candor to Jackson National, this Court believes that the facts pleaded in Count III regarding Kennedy's alleged failure to notify Jackson National of a Voting Event may properly fall within the inquiry prescribed into the entire fairness of this transaction. The allegations, if proved, will not alone be dispositive of a breach of a fiduciary duty of loyalty, but will be weighed with all other evidence offered that the disputed transaction was structured to deny Jackson National the fair opportunity to exercise its rights as preferred stockholder in Benchmark Holdings. As the *Jedwab* court concluded, where a transaction occurs without any procedural safeguards for the benefit of the preferred stockholders, these "indicia of fairness ... [do not themselves] establish any breach of duty.... [T]he ultimate question is whether the terms of the transaction are entirely or intrinsically fair." *Jedwab,* 509 A.2d at 599–600.

However, even under the liberal notice pleading requirements, "there must be some factual allegations from which 'knowing participation' can be inferred."[30] Mere conclusory statements devoid of factual details to support an allegation of knowing participation will fall short of the pleading requirement needed to survive a Rule 12(b)(6) motion to dismiss.[31] Moreover, "[a] court can infer a non-fiduciary's knowing participation only if a fiduciary breaches its duty in an inherently wrongful manner, and the plaintiff alleges specific facts from which that court could reasonably infer knowledge of the breach."[32]

Fort James asserts that, viewing the complaint in a light most favorable to Plaintiffs, no facts have been pleaded that could possibly support a claim that Fort James knowingly participated in Kennedy's alleged breaches of fiduciary duty. Fort James argues that the complaint provides no facts demonstrating that Fort James saw the Certificate before the asset purchase, that Fort James would have interpreted the Certificate to trigger rights of the preferred prior to Benchmark Holdings' ceasing its business operations, or that Fort James had any reason to believe Kennedy had a plan to breach fiduciary duties owed to Jackson National. I disagree with Fort James' assertion.

The complaint alleges that:

109. [Fort James] ... knowingly provid[ed] financial incentives to induce and aid Kennedy in ignoring his fiduciary obligations, and ... knowingly agree[d] to and benefit[ed] from a diversion of money and assets away from Benchmark Holdings and Jackson National to Kennedy and [Fort James].

110. In reviewing the variety of documents, records, financial information, and filings that it obtained during due diligence, [Fort James] became aware of:

(a) ... the issuance of preferred stock valued at no less than $7.5 million....

(c) Kennedy was the sole director of Benchmark Corp., Benchmark Holdings and WinCup Holdings.

(d) ... Kennedy was effectively the common shareholder of both Benchmark Holdings and WinCup Holdings.

111. [A]s a result of its due diligence and its negotiations with Kennedy, [Fort James] knew that ...

(b) Kennedy diverted proceeds from the sale of the assets of Benchmark Holdings to himself ... in the guise of [a] covenant[ ] not to compete....

113. In particular, [Fort James] knew the following facts ... concerning the $2 million of sales proceeds distributed to Kennedy under the guise of a non-competition agreement ...

(b) A single law firm ... represented Kennedy, Benchmark Corp., Benchmark Holdings, and WinCup Holdings.

(c) Jackson National owned 77.9% of the preferred stock of Benchmark Holdings....

(e) The preferred shareholders were not represented in the negotiations, and there were no safeguards in the negotiating process to assure that the rights and interests of Jackson National were protected....

114. In connection with Kennedy's allocation of $10 million of the sale

30. *L.A. Partners, L.P. v. Allegis Corp.*, Del. Ch. C.A. No. 9033, 1987 WL 14531, mem. op. at 18, Berger, V.C. (Oct. 22, 1987) (citing *Weinberger v. Rio Grande Indus., Inc.*, Del. Ch., 519 A.2d 116, 131 (1986)).

31. *See In re Santa Fe Pac. Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 72 (1995).

32. *Nebenzahl v. Miller, supra* note 7, at 17 (citations omitted).

proceeds to WinCup Holdings, [Fort James] also knew . . .

(d) Kennedy allocated $10 million of the $55 million of sale proceeds to WinCup Holdings. . . .

(h) There was no bona fide independent allocation of the sales proceeds between Benchmark Holdings and WinCup Holdings. . . .

115. In addition, [Fort James] knew the following facts . . . regarding Kennedy's concealment of the transaction from . . . Jackson National:

(a) . . . [Fort James] was purchasing all the operating assets of Benchmark Holdings, which would cease doing business upon the consummation of the transaction. . . .

(c) Under the Certificate . . . Jackson National had the right to take control of Benchmark Holdings. . . .

(e) . . . [T]here was reasonable and substantial probability that, were it advised of the transaction, Jackson National would exercise its voting rights under the Certificate . . . and not go forward with the transaction as structured.

In short, Plaintiffs have accused Fort James of knowingly providing financial incentives to Kennedy and inducing him to ignore his fiduciary obligations, and of knowingly agreeing to and benefiting from a diversion of money and assets away from Benchmark Holdings and Jackson National to Kennedy and Fort James. This Court has in the past held that activities which amount to more than simple arm's-length negotiations between the fiduciary and the non-fiduciary defendant, when supported by "specific details about the payments made incident to negotiating the terms of the agreement,"[33] can satisfy the knowing participation requirement needed to defeat a Rule 12(b)(6) motion seeking to dismiss claims of aiding and abetting breaches of fiduciary duties.[34]

Here, the allegations are not merely conclusory, but are supported by exhibits evidencing that Fort James knew about the Certificate and Jackson National's concomitant rights thereunder, as well as by specific details regarding the payments made incident to Fort James' purchase of the Benchmark Holdings and WinCup Holdings assets. Plaintiffs have included enough detail from which the Court could reasonably infer, at this preliminary stage, that these payments were inducements, knowingly made, to breach a duty or payments agreed to by Fort James that knowingly constituted a wrongful diversion from Jackson National. Therefore, the Complaint properly states an actionable claim for aiding and abetting breaches of fiduciary duties.

**C. Unjust Enrichment and Imposition of a Constructive Trust**

Fort James also contends that Plaintiffs fail to state a claim in Count X for unjust enrichment and imposition of a constructive trust against Fort James. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience."[35] The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law.[36] A constructive trust is

**33.** *In re USACafes*, Del. Ch., 600 A.2d at 56.

**34.** *Id.* ("While the payments, as described, may be wholly legitimate, plaintiffs have included enough detail about their size and nature to support, at least at this preliminary stage, the assertion that they were inducements, knowingly made, to breach a duty or payments . . . that knowingly constituted a wrongful diversion .") *Id.*

**35.** *Fleer Corp. v. Topps Chewing Gum, Inc.*, Del.Supr., 539 A.2d 1060, 1062 (1988).

**36.** *Cantor Fitzgerald, L.P. v. Cantor*, Del. Ch., 724 A.2d 571, 585 (1998) (citing *Khoury Factory Outlets, Inc. v. Snyder*, Del. Ch., C.A. No.

proper when "a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty."[37]

 Having pleaded sufficiently the allegations in Count IX that Fort James aided and abetted Kennedy's alleged breach of fiduciary duty to a degree sufficient to defeat this motion, it is axiomatic that Plaintiffs have likewise pleaded sufficiently the allegations that Defendants were enriched by their actions, to the impoverishment of Benchmark Holdings and Jackson National. Furthermore, a clear relation exists between the enrichment and impoverishment. If Plaintiffs succeed on the merits of their breach of fiduciary duty and aiding and abetting claims, it is likely they will also be able to prove that neither Kennedy nor Fort James can retain any benefit resulting from the disputed transaction "justifiably" or in accordance with "the fundamental principles of justice or equity and good conscience." Plaintiffs, therefore, properly state an actionable claim for unjust enrichment and imposition of a constructive trust.

## V. CONCLUSION

For the reasons stated above, I dismiss *without prejudice* the portion of the aiding and abetting claim against Fort James based on an alleged breach of the fiduciary duty of disclosure. On the other hand, I deny the motion to dismiss Plaintiffs' claim for aiding and abetting Kennedy's breach of his fiduciary duty of loyalty. Fort James' motion to dismiss Plaintiffs' claims for unjust enrichment and imposition of a constructive trust are also denied. Plaintiffs have thirty days to amend their complaint consistent with this Memorandum Opinion.

---

11568, 1996 WL 74725 at *11, Kiger, M. (Jan. 8, 1996)).

**37.** *Dodge v. Wilmington Trust Co.*, Del. Ch., C.A. No. 1257–K, mem. op. at 15, 1995 WL 106380, Chandler, V.C. (Feb. 3, 1995).