# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARK JACOBS, Individually And On Behalf Of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2019-1022-MTZ |
| MOHSIN Y. MEGHJI, JOHN PAUL ROEHM, DEREK GLANVILL, PETER JONNA, CHARLES GARNER, TERENCE MONTGOMERY, IAN SCHAPIRO, JOHN EBER, OAKTREE POWER OPPORTUNITIES FUND III DELAWARE, L.P., and ARES MANAGEMENT CORPORATION | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| INFRASTRUCTURE & ENERGY ALTERNATIVES INC., | ) ) ) | |
| Nominal Defendant. | ) ) | |

## <u>MEMORANDUM OPINION</u>
Date Submitted:  July 22, 2020
Date Decided:  October 8, 2020

Stephen E. Jenkins and Richard D. Heins, ASHBY & GEDDES, Wilmington, Delaware; Donald J. Enright, Elizabeth K. Tripodi, and Jordan A. Cafritz, LEVI & KORSINSKY, LLP, Washington, D.C., *Attorneys for Plaintiff.*

T. Brad Davey, J. Matthew Belger, and Nicholas D. Mozal, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Defendant Ares Management Corporation*.

S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Yosef J. Riemer, P.C. and Jeffrey R. Goldfine, KIRKLAND & ELLIS LLP, New York, New York, *Attorneys for Defendants Terence Montgomery and John Paul Roehm.*

Daniel A. Mason and Brendan W. Sullivan, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Andrew J. Ehrlich, Gregory Laufer, and Anika Rappleye, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, *Attorneys for Defendants Derek Glanvill, Peter Jonna, Ian Schapiro, and Oaktree Power Opportunities Fund III Delaware, L.P.*

Lisa A. Schmidt and Alexander M. Krischik, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Nominal Defendant Infrastructure & Energy Alternatives Inc.*

**ZURN, Vice Chancellor.**

A stockholder challenges a transaction in which another minority stockholder partnered with the company's controlling stockholder to infuse the company with much-needed capital. The plaintiff primarily takes issue with the actions of the company's fiduciaries, but also claims the minority stockholder aided and abetted the fiduciaries' breaches and was unjustly enriched. In pursuit of this theory, the plaintiff looks to the structure of the transaction itself—a side-by-side investment with the company's known controller—to support the inference that the minority stockholder knowingly participated in the fiduciaries' breaches.

The plaintiff's conclusory allegations of knowledge are insufficient to support his claims. To hold a defendant liable for aiding and abetting a fiduciary's wrongdoing, the plaintiff must satisfy a stringent scienter requirement: the defendant must know wrongdoing is afoot and exploit it. Absent specific facts supporting an inference of knowing participation in a breach, allegations that an investor merely participated alongside a known controller are insufficient to subject the investor to liability.

In the same vein, such benign participation cannot support the plaintiff's unjust enrichment claim. The linchpin of an unjust enrichment claim is an absence of justification for the defendant's enrichment. Where an investor is only alleged to have participated in a transaction without any knowledge of wrongdoing, its bargained-for benefit is justified, barring circumstances that would render the benefit

1

unconscionable. Accordingly, the plaintiff's claims against the minority stockholder are dismissed with prejudice.

## I. BACKGROUND

On December 20, 2019, Plaintiff Mark Jacobs filed a Verified Stockholder Derivative and Class Action Complaint (the "Complaint") in the above-captioned action against Oaktree Power Opportunities Fund III Delaware, L.P. ("Oaktree"); Mohsin Meghji, John Paul Roehm, Derek Glanvill, Peter Jonna, Charles Garner, Terence Montgomery, John Eber, and Ian Schapiro, as directors of nominal defendant Infrastructure & Energy Alternatives Inc. ("IEA" or the "Company"); and Ares Management Corporation ("Ares").[1]  Upon consideration of Ares' March 6, 2020, motion to dismiss (the "Motion"),[2] I accept the Complaint's well-pled allegations as true, draw all reasonable inferences in Plaintiff's favor, and from those allegations and inferences, discern the following pertinent facts regarding Ares' involvement in the transaction at issue.[3]

IEA is a publicly held infrastructure construction company with specialized energy and heavy-civil expertise, facilitating wind and solar energy projects across

---

[1] Docket Item ("D.I.") 1 [hereinafter "Compl."].  Plaintiff stipulated to the dismissal of Meghji, Garner, and Eber.  *See* D.I. 52.  I refer to the remaining human defendants, namely Roehm, Glanvill, Jonna, Montgomery, and Schapiro, as the "Individual Defendants."

[2] D.I. 27.

[3] *See Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251 (Del. 2019).

2

North America.  Plaintiff is an IEA minority stockholder.  Oaktree is IEA's largest and controlling stockholder, at all relevant times owning between 46.3% and 67% of IEA's common stock and appointing three out of IEA's eight board members. Ares, a publicly traded asset manager, beneficially owns 6.4% of IEA's outstanding common stock.  Non-party Hudson Bay Capital ("Hudson Bay") is an asset management firm.

Plaintiff's claims center on the competing proposals from Hudson Bay and Ares to provide IEA with capital.  In early 2019, due to delayed progress in six of its wind projects, IEA faced a severe liquidity crisis and announced it needed additional capital.  The IEA board began exploring financing sources, and on March 29, 2019, the board retained Guggenheim Partners, LLC ("Guggenheim").

Over the following month Guggenheim "contacted, and negotiated with, 83 potential parties," leading to IEA receiving "three term sheets for an equity investment."[4]  The offers from Ares and Hudson Bay both contemplated that Oaktree would participate in the transaction, to differing degrees.  IEA's board began negotiations with both bidders.

On April 25, IEA signed a non-binding term sheet with Hudson Bay, which proposed an equity financing transaction with both Hudson Bay and Oaktree.  IEA continued to explore alternative financing sources, and formed a special committee

---

[4] Compl. ¶ 82.  The third term sheet was later withdrawn.

on May 2, consisting of four IEA board members: Eber, Garner, Meghji, and Montgomery (the "Special Committee").[5] The Special Committee was formed after the board had begun negotiating with Hudson Bay and Ares; after the board "knew that either proposal would require substantial participation by Oaktree;" and after "Oaktree was already involved with the proposed transaction."[6] Over the weekend of May 4, Ares "negotiated the preliminary terms of a potential term sheet."[7]

The Special Committee met several times in May to discuss the competing proposals from Ares and Hudson Bay. Plaintiff alleges that the Special Committee was not independent and was created "out of a need to paper over the blatant conflicts that existed with Oaktree's involvement,"[8] and that "the role of the Special Committee was little more than a smoke screen for a conflicted sale process."[9] In support, Plaintiff points to the Special Committee's May 6 minutes, which disclosed that "proposed participation by Oaktree had influenced the Company's Board of Directors to establish the Committee" and that the board "discussed the potential

---

[5] Montgomery's presence on the Special Committee serves as Plaintiff's basis for the allegation that the Special Committee was conflicted. *See, e.g.*, *id.* ¶¶ 10, 89.

[6] *Id.* ¶ 83.

[7] *Id.* ¶ 82.

[8] *Id.* ¶ 86.

[9] *Id.* ¶ 87.

4

participation of funds affiliated with Oaktree with respect to both transactions."[10]

Plaintiff also points to a subsequent email from Garner, which read in pertinent part:

> The role of the Special Committee is to oversee the transaction process and, in view of Oaktree's potential conflict of interest, to ensure that the negotiations with Hudson Bay and Ares are truly conducted on an arm's-length basis - so that the outcome is fair to, all shareholders and does not favor Oaktree.  In keeping with this: . . .
>
> 3. Under no circumstances should Oaktree have calls or meetings with Ares or Hudson Bay without the Special Committee (either in full or through me) being invited to participate and, if we elect to participate, being present.  Similarly, I should be in attendance at all calls/meetings between Oaktree (on the one hand) and the IEA management team and/or advisors (on the other hand) that relate to the substance of the transactions.  Although this does NOT mean that Guggenheim, Kirkland or, anyone else is prohibited from speaking with Oaktree, the Special Committee (either in full or through me) should be copied on all correspondence and included in all calls that involve negotiation of deal terms or other areas where Oaktree's potential conflict could affect the deal terms.[11]

Plaintiff alleges that the "conflicted Special Committee steer[ed] the process toward Ares."[12]  On May 7, the Special Committee revealed that

> Hudson Bay had been further along in the process than Ares, but that Ares had been moving very quickly, had significantly improved the terms of its proposal as a result of negotiations, was offering more conventional preferred stock terms than Hudson Bay, and appeared to be interested in and able to offer a larger investment than Hudson Bay (which required significant participation from co-investors).[13]

---

[10] *Id.* ¶ 86.

[11] *Id.* ¶ 87.

[12] *Id.* at 50.

[13] *Id.* ¶ 91.

And on May 9, the Special Committee was updated on negotiations with Ares, including

> the proposed timing of final documents and closing; Ares' positive perspective regarding the proposed lender arrangements; its request for access to the lenders, based in part on the analysis from Paul Weiss (counsel to Ares) regarding the Company's potential exposure to the lenders; the status of Ares' due diligence; the proposed size of Ares' investment; the warrants to be issued in the transaction and the requirement that Oaktree invest $20 million.[14]

The Special Committee also learned "that Ares had requested Oaktree's participation to reduce Ares' initial commitment, which would allow Ares to move more quickly and to agree to terms more favorable to the Company," and "that Guggenheim had proposed that Ares invest $50 million and Oaktree $20 million but Ares had rejected that proposal and requested that Ares invest $30 million and Oaktree $20 million."[15] At the same time, the Special Committee was aware that

> Hudson Bay and the other parties had indicated that they could invest from $28 to $40 million, which would require Oaktree to invest $10 to $22 million. The Committee asked questions regarding Oaktree's ability and willingness to invest up to $22 million to ensure that the Company could raise at least $50 million. Mr. Ortner believed that the other investors ultimately would be willing to invest $30 million to keep Oaktree's participation at no more than $20 million.[16]

---

[14] *Id.* ¶ 92.

[15] *Id.*

[16] *Id.* ¶ 93. The Complaint does not identify Mr. Ortner.

Both proposals contemplated a $50 million investment, but the Ares proposal "ensured that Oaktree would be guaranteed a significant role in the proposed investment,"[17] and "[e]ven more attractive to Oaktree was the significant windfall it stood to receive should the Board elect to pursue a transaction with ARES as opposed to Hudson Bay."[18] Guggenheim's analysis reflected that the Hudson Bay proposal would have transferred $60 million in equity value to Hudson Bay and Oaktree, as compared to the Ares proposal which would transfer approximately $134 million.

On May 13, the Special Committee met twice to discuss certain requests from Ares and the best method of proceeding with negotiation. At the first meeting, the Special Committee concluded "the most effective negotiating strategy for securing the best terms from ARES would be to request fellow Board member Ian Schapiro to reach out to one of the principals at ARES, with whom Mr. Schapiro had previously worked, and emphasize the concern of the committee over certain terms."[19] Schapiro also "had a long-standing and lucrative professional relationship with Oaktree and its affiliated companies."[20]

At the second meeting,

---

[17] *Id.* ¶ 94.

[18] *Id.* ¶ 95.

[19] *Id.* ¶ 96.

[20] *Id.* ¶ 8.

> [d]iscussion ensued concerning the process, including the extensive market check for equity and debt investors, the Company's need for financing, the competing offers from Ares and Hudson Bay . . . , and the participation by Oaktree in each such transaction required by Ares and Hudson Bay. Guggenheim advised that the terms of the Ares proposal were superior to the terms offered by Hudson Bay. Following further discussion, the Committee determined that the Ares proposal was in the best interests of the Company and its stockholders (other than Oaktree) and determined to recommend approval of the transaction to the Board of Directors. The Committee unanimously adopted the resolutions that had been circulated to the Committee in advance of the meeting.[21]

On May 14, the Special Committee executed a written consent approving the Ares deal; it was dated May 13.

The Ares transaction contemplated the amendment and early conversion of the Company's Series A Preferred Stock, as well as the creation and issuance of Series B Preferred Stock and warrants. Oaktree and Ares agreed to purchase $50 million of newly created Series B Preferred Stock from the Company, in addition to receiving initial warrants with an exercise price of $.01 per share for the purchase of up to 2,545,934 million shares of the Company's common stock, with the opportunity to obtain warrants for up to an additional 6% of the Company's fully diluted common stock outstanding in the event that the Company failed to meet certain performance targets. The Series A conversion, Series B issuance, and

---

[21] *Id.* ¶ 97.

warrants issuance would culminate in a cash payout for Oaktree and Ares over five years.

Stockholders were not informed of the negotiation process. After announcing its need for additional capital, IEA did not further inform stockholders of its plan to secure that capital until May 16, when, in the process of announcing its financial results for the quarter ended March 31, the Company announced that IEA secured a $50 million equity commitment agreement with Ares and Oaktree.

On May 20, to facilitate the Ares transaction, the Company issued warrants to Ares and Oaktree in a private placement. The board and the holders of a majority of the Company's outstanding Series A Preferred Stock also amended the terms of that stock to permit its early conversion to common stock. The documents amending the terms of the Series A Preferred Stock also permitted the issuance of Series B Preferred Stock, among other things. On May 22, IEA issued a press release dated May 20 stating that it agreed to and completed a transaction with Ares. Shortly thereafter, Oaktree filed a Schedule 13D with the SEC, revealing that it had increased its ownership to 48.7% as a result of the May 20 private placement.

Completion of the Ares transaction required stockholder approval of the Series A conversion and warrants issuance. Accordingly, on June 27, IEA filed a proxy statement with the SEC, soliciting stockholder support. Plaintiff contends that the proxy statement did not disclose material information regarding the propriety of

9

the transaction, the Hudson Bay proposal, and "the process and/or negotiations between IEA and Oaktree concerning the agreements."[22]

On August 14, 14,602,634 shares, representing 65.6% of IEA's issued and outstanding common stock, voted on the Series A conversion and warrants issuance; the majority of voting shares approved.[23] The transaction was not conditioned on or approved by a majority of the minority vote. Stockholders were unaware of competing offers, and so did not know the terms of Hudson Bay's offer which, according to Plaintiff, threatened less dilution for IEA stockholders and was less expensive than the Ares deal. On August 16, Oaktree filed a new Schedule 13D disclosing that, as a result of the stockholder vote, it controlled 67% of IEA on a fully diluted basis.

Plaintiff challenges the Ares transaction as being "extraordinarily sweet" for Oaktree and Ares, to the detriment of the Company and IEA's minority stockholders, and as failing to provide sufficient information to IEA stockholders. Plaintiff alleges that because the Ares deal "provided an outsized benefit to ARES and Oaktree,"[24] who stood to receive roughly $134 million in cash after five years, the reasonable inference is that "instead of allowing IEA to enter a transaction with Hudson Bay,

---

[22] *Id.* ¶¶ 80, 101.

[23] Of the shares that voted, 13,744,934 approved the warrants issuance, and 13,993,099 approved the Series A conversion.

[24] Compl. ¶ 110.

Oaktree used its control over the Company, aided and abetted by ARES, to cause IEA to enter the extremely high-priced ARES and Oaktree Transaction."[25]

Plaintiff brought direct and derivative breach of fiduciary duty claims against the Individual Defendants, challenging the board's decisions (a) to pursue the "grossly unfair and severely dilutive" Ares transaction and to reject the allegedly "superior proposal" form Hudson Bay;[26] (b) to appoint a Special Committee late in the negotiation process after Oaktree's involvement was known, which Plaintiff in turn challenges as not being fully disinterested, independent, and empowered; and (c) to "[a]llow[] interested directors to taint negotiations."[27] Plaintiff also directly and derivatively claims Oaktree, as IEA's alleged controller, breached its duties to IEA's minority stockholders by acting in its own interest to the detriment of the minority.

In Counts VI and VII, Plaintiff asserts direct and derivative claims that Ares aided and abetted the Individual Defendants' breaches of fiduciary duty; those Counts do not allege that Ares aided and abetted Oaktree's breaches.[28] In Count V,

---

[25] *Id.* ¶ 14.

[26] *Id.* ¶¶ 148(g), 154(h).

[27] *Id.* ¶ 148(f).

[28] *See id.* ¶¶ 176–82.

11

Plaintiff asserts a claim for unjust enrichment against Ares and Oaktree,[29] claiming that "Ares [] shared in the wrongful benefits" Oaktree retained from its misconduct.[30]

On March 6, 2020, Jonna, Schapiro, Glanvill, Montgomery, Rohem, and Oaktree answered the Complaint.[31] That same day, Ares filed this Motion, seeking dismissal of Plaintiff's aiding and abetting and unjust enrichment claims.[32] The Motion was briefed,[33] and the parties presented argument on July 22.[34] For the following reasons, the Motion is granted.

## II.   ANALYSIS

This opinion addresses Ares' Motion pursuant to Court of Chancery Rule 12(b)(6). "The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established."[35] The Court accepts all well-pled allegations as true and draws all reasonable inferences in favor of the non-movant.[36] However, the Court "need not accept conclusory allegations as true, nor

---

[29] *See id.* ¶¶ 171–75.

[30] *Id.* ¶ 175.

[31] *See* D.I. 29, 34.

[32] D.I. 27.

[33] D.I. 27, 55, 58.

[34] D.I. 69, 70.

[35] *Feldman v. Cutaia*, 2006 WL 920420, at *7 (Del. Ch. Apr. 5, 2006).

[36] *Sheldon*, 220 A.3d at 251.

should inferences be drawn unless they are truly reasonable."[37]  A motion to dismiss will be granted only if "it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading,"[38] and "failure to plead an element of a claim warrants dismissal under Rule 12(b)(6)."[39]

## A. Plaintiff Has Failed To Allege That Ares Knowingly Participated In Any Fiduciary Breach.

Plaintiff claims that Ares aided and abetted the Individual Defendants' breaches of fiduciary duty, stating Ares

> knowingly and affirmatively participated with the Individual Defendants in a course of conduct that was intended to, and did, aid and abet their Breaches of Fiduciary Duties to IEA's stockholders. Defendants knew that their aiding and abetting of the actions of the Individual Defendants in approving the Transactions would cause substantial injury to IEA's stockholders, and such harm was a direct and foreseeable result of Defendants' actions.[40]

In pursuit of this theory, Plaintiff suggests that Ares negotiated with the board before the Special Committee was formed.  Plaintiff also alleges that "taken together, ARES and Oaktree's control of IEA stock prior to the share issuance was in excess

---

[37] *Id.*

[38] *Feldman*, 2006 WL 920420, at *7.

[39] *Miramar Police Officers' Ret. Plan v. Murdoch*, 2015 WL 1593745, at *7 (Del. Ch. Apr. 7, 2015).

[40] Compl. ¶ 177; *accord id.* ¶ 180 ("ARES knowingly and affirmatively participated with the Directors in a course of conduct that was intended to, and did, aid and abet their Breaches of Fiduciary Duties to IEA and the stockholders. Defendants knew that their aiding and abetting of the Directors' breaches of fiduciary duties would cause substantial injury to IEA, and such harm was a direct and foreseeable result of Defendants' actions.").

of 50%."[41]  Plaintiff also contends that Schapiro, who the Special Committee sent to negotiate with Ares on May 13, was an "Oaktree affiliated director"[42] who also "had longstanding and well-known connections with ARES.  Accordingly, with absolute majority ownership through the combined power of Oaktree and ARES stock ownership, as well as a significant presence on the IEA Board, it is little wonder that the Transactions were directed towards ARES and Oaktree."[43]

> Plaintiff also relies on the terms of the transaction, alleging
>
> ARES knew that the Transactions' terms were unfairly skewed in its favor as a result of Oaktree's influence, but was incented to go forward because it was benefitting from those same terms.  As a financially sophisticated entity, ARES knew at all relevant times that the terms of the Transactions were not commercially typical, but rather involved unfairly high dividend yield rates (in connection with the Series B Preferred Stock) and unfairly valuable benefits to ARES and Oaktree in return for unfairly low consideration.  Because ARES received essentially identical treatment to that accorded Oaktree in the Transactions, it proceeded with the Transactions and reaped the benefits of the breaches of fiduciary duty and other wrongs complained of herein.[44]

Plaintiff goes on:

---

[41] *Id.* ¶ 61.

[42] *Id.* ¶ 38.

[43] *Id.* ¶ 61.

[44] *Id.* ¶ 132.

The issuance of the Warrants, which entitles Oaktree and ARES to IEA common stock at a bargain price, and the Series A Conversion, which entitles Oaktree to the transference of Series A Preferred Stock into IEA common stock at a bargain price, not only transferred tens of millions of dollars of value to Defendants, it also effectively transferred clear majority control of the Company to Oaktree.[45]

This Court has articulated the pleading standard for a claim of aiding and abetting breach of fiduciary duty:

> To plead a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach. An adequate pleading of "knowing participation" requires a pleading of scienter.[46]

Ares contends Plaintiff has failed to plead knowing participation. That scienter requirement imposes a "stringent" standard.[47] "[T]he plaintiff must demonstrate that

---

[45] *Id.* ¶ 133.

[46] *RCS Cred. Tr. v. Schorsch*, 2018 WL 1640169, at *5 (Del. Ch. Apr. 5, 2018) (internal quotation marks omitted) (quoting *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015), and then quoting *Cumming v. Edens*, 2018 WL 992877, at *26 (Del. Ch. Feb. 20, 2018)). Typically, "the question of whether a defendant acted with *scienter* is a factual determination." *RBC Capital Mkts., LLC*, 129 A.3d at 862. However, the Court will grant a motion to dismiss an aiding and abetting claim where "there is no indication in the [] complaint that [the defendant] participated in the board's decisions, conspired with [sic] board, or otherwise caused the board to make the decisions at issue," and therefore the allegations in the complaint do not support an inference that the defendant knowingly participated in a fiduciary breach. *Malpiede v. Townson*, 780 A.2d 1075, 1098 (Del. 2001).

[47] *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 688 (Del. Ch. 2017) (quoting *Lee v. Pincus*, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014)).

the aider and abettor had actual or constructive knowledge that their conduct was legally improper."[48]

The Delaware Supreme Court has stated that "[k]nowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."[49]  Where the complaint does not plainly allege the third party "conspired with the directors to breach a fiduciary duty, a court can infer a non-fiduciary's knowing participation only if a fiduciary breaches its duty in an inherently wrongful manner, and the plaintiff alleges *specific facts* from which that court could reasonably infer knowledge of the breach."[50]  But "[c]onclusory statements that are devoid of factual details to support

---

[48] *RCS Cred. Tr.*, 2018 WL 1640169, at *5 (internal quotation marks omitted) (quoting *RBC Capital Mkts., LLC*, 129 A.3d at 862).

[49] *RBC Capital Mkts., LLC*, 129 A.3d at 861–62 (quoting *Malpiede*, 780 A.2d at 1097); *see also In re Telecomms., Inc. S'holders Litig.*, 2003 WL 21543427, at *2 (Del. Ch. July 7, 2003) ("[I]t is necessary that the plaintiffs make factual allegations from which knowing participation may be inferred in order to survive a motion to dismiss.  For example, knowing participation may be inferred where the terms of the transaction are so egregious or the magnitude of side deals is so excessive as to be inherently wrongful.  In addition, the Court may infer knowing participation if it appears that the defendant may have used knowledge of the breach to gain a bargaining advantage in the negotiations.  The plaintiff's burden of pleading knowing participation may also be met through direct factual allegations supporting a theory that the defendant sought to induce the breach of fiduciary duty, such as through the offer of side payments intended as incentives for the fiduciaries to ignore their duties." (footnotes omitted)).

[50] *McGowan v. Ferro*, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002) (emphasis in original) (internal quotation marks omitted) (quoting *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 392 (Del. Ch. 1999)).

an allegation of knowing participation will fall short of the pleading requirement needed to survive a Rule 12(b)(6) motion to dismiss."[51]

Because a bidder has "the right to work in its own interests to maximize its value," the plaintiff faces a high burden when pleading an aiding and abetting claim against a transactional counterparty.[52] As Vice Chancellor Glasscock recently noted, "[i]n evaluating a typical aiding and abetting claim, the legal analysis is simple enough:  Has the predicate tort occurred?  If yes, has the third party, with the requisite scienter, aided in the commission of the tort?"[53] However, "[a] twist occurs where the litigation is an attempt by former stockholders to hold a third party liable for self-serving actions that enabled an unfair merger process."[54] This Court adheres to "the long-standing rule that arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting."[55]

A bidder is "under no duty or obligation to negotiate terms that benefited [the target] or otherwise to facilitate a superior transaction for [the target]."[56]

---

[51] *Id.* (internal quotation marks omitted) (quoting *Jackson Nat'l Life Ins. Co.*, 741 A.2d at 392).

[52] *Morrison v. Berry*, 2020 WL 2843514, at *11 (Del. Ch. June 1, 2020).

[53] *Id.* at *8.

[54] *Id.*

[55] *Morgan v. Cash*, 2010 WL 2803746, at *1 (Del. Ch. July 16, 2010).

[56] *In re Rouse Props., Inc.*, 2018 WL 1226015, at *25 (Del. Ch. Mar. 9, 2018).

Accordingly, "a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting."[57] "To allow a plaintiff to state an aiding and abetting claim against a bidder simply by making a cursory allegation that the bidder got too good a deal is fundamentally inconsistent with the market principles with which our corporate law is designed to operate in tandem."[58]

"[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders."[59] As an example, "a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board,"[60] or "where the bidder and the board conspire in or agree to the fiduciary breach."[61] "If the third party knows that the board is breaching its duty of care and participates in

---

[57] *Malpiede*, 780 A.2d at 1097.

[58] *Morgan*, 2010 WL 2803746, at *8.

[59] *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990); *see also In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *18 (Del. Ch. Dec. 30, 2019).

[60] *Malpiede*, 780 A.2d at 1097.

[61] *Id.* at 1097–98.

the breach by misleading the board or creating the informational vacuum, then the third party can be liable for aiding and abetting."[62]

For purposes of today's analysis, I assume that Plaintiff has adequately pled an underlying breach of fiduciary duty and has therefore satisfied the breach element of an aiding and abetting claim.[63] Ares argues that Plaintiff has failed to plead facts from which I may reasonably infer that Ares had actual or constructive knowledge of the Individual Defendants' breaches. I agree.

### 1. Plaintiff Has Not Established Actual Knowledge Of The Individual Defendants' Breaches.

Counts VI and VII seek to hold Ares liable for aiding and abetting the Individual Defendants' wrongdoing. I first consider whether Plaintiff has alleged Ares had actual knowledge of the Individual Defendants' breaches.[64] Plaintiff bears the stringent burden of alleging "specific facts from which [the] court could reasonably infer knowledge" of the specified breach.[65] The Complaint's silence is deafening: Plaintiff does not plead Ares had any knowledge about IEA's process, the Special Committee's creation or role, Hudson Bay's proposal, or the Individual

---

[62] *RBC Capital Mkts., LLC*, 129 A.3d at 862 (alteration omitted) (quoting *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 97 (Del. Ch. 2014)).

[63] Indeed, the remaining Individual Defendants and Oaktree have not moved to dismiss the fiduciary duty claims against them, but instead answered the Complaint. *See* D.I. 29, 34.

[64] *See RCS Cred. Tr.*, 2018 WL 1640169, at *5.

[65] *McGowan*, 2002 WL 77712, at *2 (emphasis omitted) (quoting *Jackson Nat'l Life Ins. Co.*, 741 A.2d at 392).

Defendants' compliance with their fiduciary duties. The Complaint fails to allege Ares was aware of, much less involved in, any flaws in decision making by the board, Special Committee, or Guggenheim.

The Complaint suggests that the board negotiated with Ares before the Special Committee was formed. But Plaintiff does not allege anything about those discussions that supports an inference that Ares knew about or participated in any breach of fiduciary duty.[66] "The Complaint lacks any reference to non-conclusory communications between [Ares] and the [IEA board] that would support an inference of concerted activity."[67] Plaintiff does not allege that Ares was involved in the decision to create the Special Committee, the timing of its creation, or its composition.

And once the Special Committee was formed, Plaintiff does not allege any facts from which the Court may infer that Ares had any knowledge of flaws in, or control or influence over, the Special Committee's negotiations. The Complaint alleges only that Ares negotiated with the Special Committee for its own benefit. Plaintiff does not allege facts from which the Court may infer that Ares' dealings

---

[66] *See Se. Pa. Transp. Auth. v. Volgenau*, 2013 WL 4009193, at *27 (Del. Ch. Aug. 5, 2013) (rejecting an aiding and abetting claim where "[t]here [was] no evidence in the record that [the bidder] and [the target], during their initial meetings, hatched a plan for [the bidder] to 'opportunistically' acquire [the target] at a bargain price"), *aff'd*, 91 A.3d 562 (Del. 2014).

[67] *In re Essendant, Inc.*, 2019 WL 7290944, at *17.

20

with the Special Committee "amounted to anything other than arm's-length negotiations."[68]

Accordingly, the Complaint is devoid of any allegations that Ares knew the Individual Defendants were breaching their fiduciary duties and exploited or participated in such breaches to facilitate the transaction to the detriment of Ares' fellow minority stockholders.

### 2. Plaintiff Has Not Established Ares Knew Of Oaktree's Wrongdoing, Nor Had Constructive Knowledge Of The Individual Defendants' Breaches.

In the absence of pleading any direct knowledge of the Individual Defendants' flawed process or decision making, Plaintiff attempts to meet his burden by linking Ares to Oaktree. Counts VI and VII do not allege that Ares aided and abetted any

---

[68] *See In re AmTrust Fin. Servs., Inc. S'holder Litig.*, 2020 WL 914563, at *15 (Del. Ch. Feb. 26, 2020). Plaintiff relies on the Special Committee's selection of Schapiro as negotiator not to show actual knowledge of the Individual Defendants' breaches, but to show constructive knowledge via Oaktree's breaches. D.I. 55 at 27. I therefore consider that allegation in Section II(A)(2), *infra*.

To the extent Plaintiff asks the Court to infer that Ares knew the Special Committee was breaching its fiduciary duties by utilizing Schapiro's connection to Ares to further Oaktree's aims, the Complaint fails to allege facts sufficient to support this inference and renders it conclusory. *See In re AmTrust Fin. Servs., Inc.*, 2020 WL 914563, at *15 (rejecting as insufficient to support a reasonable inference of knowing participation the plaintiff's claim that "it was widely known that the *chairperson* of the Special Committee . . . was a longtime friend, lawyer, business associate and ally of" the controller, who also served on the board of another controller-affiliated company (emphasis in original) (alteration and internal quotation marks omitted)).

21

breach by Oaktree.[69]  Plaintiff asserts Ares had constructive knowledge of the Individual Defendants' breaches because it purportedly had actual or constructive knowledge of *Oaktree's* wrongdoing.[70]  Plaintiff theorizes that Oaktree's domination was so complete that Ares must have known the process was rigged to "facilitate[] Oaktree's ability to dictate the terms of the transaction in its favor,"[71] leading to "constructive knowledge" of the Individual Defendants' breaches.[72]

---

[69] *See* Compl. ¶ 177 ("ARES knowingly and affirmatively participated with the *Individual Defendants* in a course of conduct that was intended to, and did, aid and abet their Breaches of Fiduciary Duties to IEA's stockholders.  Defendants knew that their aiding and abetting of the actions of the *Individual Defendants* in approving the Transactions would cause substantial injury to IEA's stockholders, and such harm was a direct and foreseeable result of Defendants' actions." (emphasis added)); *id.* ¶ 180 ("ARES knowingly and affirmatively participated with the *Directors* in a course of conduct that was intended to, and did, aid and abet their Breaches of Fiduciary Duties to IEA and the stockholders.  Defendants knew that their aiding and abetting of the *Directors'* breaches of fiduciary duties would cause substantial injury to IEA, and such harm was a direct and foreseeable result of Defendants' actions." (emphasis added)).

[70] The parties did not parse Counts VI and VII's aiding and abetting allegations between Oaktree's breaches and the Individual Defendants' breaches.  In one conclusory paragraph, the Complaint alleges that "Oaktree used its control over the Company, aided and abetted by ARES, to cause IEA to enter the extremely high-priced ARES and Oaktree Transaction."  *Id.* ¶ 14.  But Counts VI and VII allege only that Ares aided and abetted the Individual Defendants' breaches.  *See id.* ¶¶ 177, 180.  In opposing dismissal of those Counts, Plaintiff relies on Ares' alleged knowledge of Oaktree's breaches.  *See* D.I. 55 at 3–4, 27, 28, 29.  My analysis focuses on why knowledge about Oaktree and its involvement in the process falls short of establishing constructive knowledge of the Individual Defendants' breaches.  My reasoning also demonstrates why that knowledge falls short of establishing knowing participation in Oaktree's breaches.

[71] D.I. 55 at 8.

[72] *See RCS Cred. Tr.*, 2018 WL 1640169, at *5.

Plaintiff fails to allege Ares' knowledge of Oaktree's breaches, and fails to demonstrate that knowledge of Oaktree's breach could transitively or constructively support knowledge of the Individual Defendants' breaches. Plaintiff's chosen links between Ares and Oaktree do not demonstrate that Ares know of any Oaktree wrongdoing, and therefore cannot serve as the basis of constructive knowledge of the Individual Defendants' breaches. I take each link in turn.

First, Plaintiff contends the Special Committee's decision to elect Schapiro to negotiate with Ares gave Ares actual or constructive knowledge of Oaktree's breaches and, therefore, constructive knowledge of the Individual Defendants' breaches.[73] The Special Committee selected Schapiro to negotiate with Ares. Plaintiff claims Ares should have inferred some nefarious motive from that selection because of Schapiro's connection to an Ares principal and because "Schapiro was not just another board member—he is one of the Oaktree employees most responsible for Oaktree's investment in the Company, and so he had a direct conflict of interest between his duties to Oaktree and his duties to the Company."[74]

---

[73] *See* D.I. 55 at 27 ("[E]ven if Ares somehow did not already know the fix was in, it absolutely knew that the Special Committee's envoy was directly conflicted. Not surprisingly, the bid went to Ares that very day. . . . It is hard to fathom how, given these facts, and especially given that it knew that Mr. Schapiro had a direct conflict of interest, Ares can claim that it did not have even constructive knowledge that Oaktree was deeply engaged in an obvious self-dealing in breach of its fiduciary duties. Again, Oaktree [sic] not only asks to be given the benefit of an inference, but an obviously unreasonable inference.").

[74] *Id.* at 26.

This Court has declined to infer knowing participation where an otherwise arm's-length *bidder* has recruited or involved persons affiliated with the target or its controller in the bidding process to increase the likelihood of effectuating a deal.[75] Here, the Special Committee, not Ares or Oaktree, selected Schapiro to negotiate with Ares. Further, Plaintiff does not allege that Ares encouraged communications through Schapiro, learned of Oaktree's duplicity through him, learned of flaws in the transaction process through him, or in any way exploited Schapiro's alleged conflict of interest. At bottom, the Complaint alleges no facts from which I may reasonably infer that Ares used Schapiro's relationship with one of Ares' employees, or Schapiro's Oaktree affiliation, "to create or exploit conflicts of interest in the board."[76]

Second, Plaintiff takes issue with the fact that Ares participated in the transaction alongside Oaktree, a known controller, and asks the Court to infer knowledge of wrongdoing from that vantage point. The Complaint alleges Ares knew (a) Oaktree held a controlling stake in IEA; (b) Ares would participate

---

[75] *See Volgenau*, 2013 WL 4009193, at *4, *10, *27 (rejecting an aiding and abetting claim, even though the defendant utilized relationships with the board in the transaction process).

[76] *Malpiede*, 780 A.2d at 1097; *see In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525, at *12 (Del. Ch. June 18, 2018) ("Plaintiffs offer the conclusory allegation that Auris exploited its existing relationship with the Controller Defendants, and effectuated a merger in which Hansen's Control Group (i.e., the Controller Defendants), or alternatively Defendant Schuler alone, received a benefit not shared with the minority stockholders, and which was unfair to minority stockholders. But, Plaintiffs plead no facts to support that Auris knew of, let alone exploited, any conflicts." (internal quotation marks omitted)).

24

alongside Oaktree; and (c) both Ares and Oaktree would obtain certain benefits from the transaction. But the Complaint does not allege Ares had any knowledge that Oaktree wrongfully orchestrated and infected IEA's transaction process such that Ares would know the Individual Defendants were breaching their duties. It does not allege that Ares exploited Oaktree's involvement and participated alongside Oaktree to extract terms that would require IEA to subjugate the interests of its stockholders.[77] Participating alongside a known controller in a beneficial transaction, without more, does not give rise to aiding and abetting liability.

Plaintiff first asks the Court to infer the requisite scienter from Ares' knowledge that Oaktree controlled IEA. Mere knowledge that a co-investor was a fiduciary does not support the reasonable inference of knowledge that the fiduciary breached its duties. And the Complaint explicitly acknowledges that both Ares and Hudson Bay, knowing Oaktree's stake in the Company, required Oaktree's participation in the proposed financing. Ares is no different than Hudson Bay in that regard. Knowledge of Oaktree's position, without more, cannot give rise to the reasonable inference that Ares knew Oaktree infected, and the board permitted, a process in breach of their fiduciary duties.

---

[77] *See In re Essendant, Inc.*, 2019 WL 7290944, at *18; *McGowan*, 2002 WL 77712, at *2; *Gilbert*, 490 A.2d at 1058.

Plaintiff next asks the Court to infer Ares' knowing participation from the transaction's structure. Plaintiff alleges that "taken together, ARES and Oaktree's control of IEA stock prior to the share issuance was in excess of 50%," and that their combined ownership somehow influenced the transaction.[78] This mathematical observation does not support aiding and abetting liability.[79] There is no indication that by agreeing to invest alongside Oaktree, Ares knew Oaktree wrongfully influenced the transaction and exploited that influence to secure a lucrative deal. Nor do the allegations give rise to the reasonable inference that by pursuing a side-

---

[78] Compl. ¶ 61.

[79] *Cf. In re Essendant, Inc.*, 2019 WL 7290944, at *8–9, *18. To be clear, Plaintiff has not alleged that Ares, either alone as a minority stockholder or in cooperation with Oaktree, owed any fiduciary duties to its fellow minority stockholders; Plaintiff seeks to hold Ares liable only for aiding and abetting, or benefitting from, breaches by actual fiduciaries. However, I note that Plaintiff's argument flirts with the idea that Ares was somehow elevated to a position of control by partnering with Oaktree. Read that way, Plaintiff would unfairly impute upon Ares—an IEA minority stockholder—a duty to its peers that it does not owe. *See id.*; *see also Greenfield v. Tele-Commc'ns, Inc.*, 1989 WL 48738, at *2 (Del. Ch. May 10, 1989) ("Analysis of whether a claim has been stated against the moving defendants begins with the recognition that those persons owe no fiduciary duty to the plaintiff class. They owe to plaintiff only such duties as they assume by contract or those which every person owes to every other. Thus, in order to state a claim on these facts, where no breach of contract is alleged, it is necessary for plaintiff to plead facts which would extend to the moving defendants the fiduciary duty that defendant [controller] bore to the minority stockholders of [the company]. The attempt to extend such a duty is, of course, not an unknown situation to the law. It is generally treated by the law of aiding and abetting . . . or knowing participation in a breach of fiduciary duty."). Where a bidder holds a minority stake at the time of the transaction, "with no facts to serve as anchor, the conclusory allegations of domination and control drift over the falls." *In re Essendant, Inc.*, 2019 WL 7290944, at *8. The allegations in the Complaint do not give rise to a reasonable inference that, by investing alongside Oaktree, Ares controlled or influenced the transaction process.

by-side investment, Ares and IEA's fiduciaries agreed to or conspired in any breach. The allegation that Ares combined its equity with Oaktree, without more, does not support the inference that Ares knew of any wrongdoing by Oaktree or the Individual Defendants.

Finally, Plaintiff conclusorily alleges that Ares "knew" the transaction was unfairly structured for Oaktree's benefit.[80] Plaintiff does not allege specific facts from which the Court may infer this knowledge. And Ares' purported awareness that "the terms of the Transactions were not commercially typical"[81] does not support an inference that Ares knew of the allegedly superior Hudson Bay terms and the Individual Defendants' breach in rejecting the superior deal.

At a fundamental level, Ares had the right to secure for itself a favorable deal, even if it Ares knew its offer was inferior.[82] "Even if the Complaint alleged (which it does not expressly) that [Ares] knew its proposal was inferior to [Hudson Bay]'s and that the [IEA board], nevertheless, was favoring the [Ares] proposal over the

---

[80] Compl. ¶ 132; *see also* D.I. 55 at 19.

[81] Compl. ¶ 132. Plaintiff also asserts in briefing that Ares has "enormous resources" and a "[h]igh [d]egree of [s]ophistication," and speculates that therefore Ares would have had "significant private discussions with Oaktree," that "those discussions ended up in a satisfactory place for Ares" and that Oaktree "provided Ares with enough information that gave it comfort that the Ares/Oaktree bid would be the winning bid." D.I. 55 at 23–24. This abstract theory is not supported by any well-pled facts, and I do not rely on it here.

[82] *See, e.g.*, *In re Essendant, Inc.*, 2019 WL 7290944, at *18; *In re Rouse Props., Inc.*, 2018 WL 1226015, at *25.

27

[Hudson Bay] proposal, this alone would be inadequate to state an aiding and abetting claim."[83] The fact that the IEA board preferred Ares' proposal to Hudson Bay's proposal "cannot be laid at [Ares'] feet as supporting an inference that [Ares] somehow aided and abetted the [IEA] fiduciaries in making that determination."[84] Absent specific factual allegations supporting an inference that Ares was aware of Oaktree and the Individual Defendants' alleged breaches, Ares was "under no duty or obligation to negotiate terms that benefited [IEA] or otherwise to facilitate a superior transaction for [IEA]."[85] Plaintiff has failed to plead specific facts supporting the inference that Ares knew of any IEA fiduciary's breaches.

More holistically, Plaintiff does not allege facts that suggest that Oaktree, or any other defendant, breached fiduciary duties "in such an inherently wrongful manner that [Ares] could not help but know of the breach and then facilitate it by its continued engagement with" Oaktree.[86] Rather, the Complaint demonstrates that Ares knew it was engaging with the Special Committee, which determined Ares'

---

[83] *In re Essendant, Inc.*, 2019 WL 7290944, at *18 (citing *McGowan*, 2002 WL 77712, at *4).

[84] *Id.*; *see* Compl. ¶ 97 (noting that "Guggenheim advised that the terms of the Ares proposal were superior to the terms offered by Hudson Bay," and that "[f]ollowing further discussion, the Committee determined that the Ares proposal was in the best interests of the Company and its stockholders").

[85] *In re Rouse Props., Inc.*, 2018 WL 1226015, at *25; *accord In re Essendant, Inc.*, 2019 WL 7290944, at *18.

[86] *See In re Essendant, Inc.*, 2019 WL 7290944, at *17 (internal quotation marks omitted) (quoting *McGowan*, 2002 WL 77712, at *2).

participation alongside Oaktree was in the best interests of IEA and its stockholders, as supported by Guggenheim's conclusion that the Ares' side-by-side investment was superior.[87]

Drawing all reasonable inferences in Plaintiff's favor, the Complaint alleges simply that Ares' participation "was the product of arm's-length negotiations" that "are inconsistent with participation in a fiduciary breach."[88] Consistent with longstanding principles of law and capitalism, Ares exercised its right to secure for itself a "sweet" deal.[89] It did not "knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders."[90] Plaintiff's "cursory allegation that [Ares] got too good a deal is fundamentally inconsistent with the market principles with which our corporate law is designed to operate in tandem" and cannot carry the day.[91] Counts VI and VII are dismissed.

---

[87] This characterization of the Complaint is from Ares' perspective. Time and discovery will reveal the depth of any fiduciary breaches.

[88] *Malpiede*, 780 A.2d at 1098; *see also In re MeadWestvaco*, 168 A.3d at 688 ("To the contrary, the Complaint's allegations paint a picture of genuine arm's-length bargaining that is the antithesis of an aiding and abetting claim.").

[89] Compl. ¶¶ 16, 18.

[90] *Gilbert*, 490 A.2d at 1058.

[91] *Morgan*, 2010 WL 2803746, at *8; *see also In re Essendant, Inc.*, 2019 WL 7290944, at *18.

## B. Plaintiff Has Failed To Allege That Ares Was Unjustly Enriched.

Plaintiff also brings Count V against Ares for unjust enrichment.[92]  Plaintiff claims Ares was unjustly enriched by the transaction because "Ares also shared in the wrongful benefits" Oaktree retained from its misconduct.[93]  This is Count V's sole allegation against Ares; Count V's remaining allegations are directed at Oaktree.[94]

"Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[95]  "The elements of unjust enrichment

---

[92] *See* Compl. ¶¶ 172–74.

[93] *Id.* ¶ 175.

[94] *See id.* ¶ 172 ("At all times alleged herein, Oaktree owed fiduciary duties to IEA and its stockholders, including Plaintiff."); *id.* ¶ 173 ("As alleged in detail herein, Oaktree caused the Company to enter into the Transactions.  As a result of its actions, Oaktree received benefits from the Transactions far in excess of the consideration it provided, and received such benefits solely as a result of its control position.  These benefits included:  (a) the Warrants, for which Oaktree paid unfairly low consideration, (b) the common stock received in exchange for the Series A Preferred Stock, in which the exchange ratio was unfairly generous to Oaktree, and benefitted Oaktree at the expense of IEA; (c) the Series B Preferred Stock, which pays a dividend yield far in excess of what the market would yield in the absence of Oaktree's control over IEA; and (d) actual *de jure* majority control over IEA."); *id.* ¶ 174 ("Accordingly, Oaktree has been unjustly enriched as a result of its misconduct as detailed above.  It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Oaktree to retain the improper benefits it received as a result of their misconduct.  Such benefits should be ordered to be returned to IEA.").

[95] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[96]

Plaintiff must plead each element of his claim.[97] Read in a vacuum, Count V's lone allegation against Ares is conclusory at best, but "vagueness or lack of detail are not sufficient grounds alone to dismiss for failure to state a claim so long as the complaint provides the defendant with notice of the claim."[98] Even so, reading the Complaint in the light most favorable to Plaintiff, Plaintiff has failed to allege a necessary element of its unjust enrichment claim: the absence of justification.

Aiding and abetting and unjust enrichment claims often rise and fall together: "where a breach of fiduciary duty claim based on the same facts and circumstances fails, the Court often dismisses the corresponding unjust enrichment claim."[99] So

---

[96] *Id.*

[97] *Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *6 (Del. Ch. Apr. 30, 2014) ("[F]ailure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.").

[98] *Marina View Condo. Ass'n of Unit Owners v. Rehoboth Marina Ventures, LLC*, 2018 WL 1172581, at *5 (Del. Ch. Mar. 6, 2018) (citing *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011), and also citing *Morgan v. Wells*, 80 A.2d 504, 505 (Del. Ch. 1951)), *adopted*, 2018 WL 1411654 (Del. Ch. Mar. 20, 2018).

[99] *In re Molycorp, Inc. S'holder Deriv. Litig.*, 2015 WL 3454925, at *11 (Del. Ch. May 27, 2015) (citing *Frank v. Elgamal*, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014)); *see also, e.g.*, *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 657 (Del. Ch. 2008) (dismissing an unjust enrichment claim because "for the same reasons as the complaint fails to plead facts supporting an inference that [the defendant] was knowingly complicit in any breach of fiduciary duty, it also fails to support an inference that [the defendant] was engaged in some form of wrongdoing"); *Jackson Nat. Life Ins. Co.*, 741

too here:  Plaintiff's unjust enrichment claim against Ares fails, as it is based on the same facts and circumstances as the failed aiding and abetting breach of fiduciary duty claim.[100]  As to Ares, Count V alleges only that "ARES also shared in the wrongful benefits and its wrongful gains should also be recouped"—not that Ares knew of or was involved in Oaktree's fiduciary breaches.[101]

Plaintiff posits that Ares need not actually have been involved, contending that simply benefitting from another defendant's wrongdoing is enough to support a claim of unjust enrichment.  In this case, Plaintiff is incorrect.  Because there must be an absence of justification for the defendant's benefit obtained through the challenged transaction, "[t]hat requirement usually entails some type of wrongdoing

---

A.2d at 394 ("Having pleaded sufficiently the allegations . . . that Fort James aided and abetted Kennedy's alleged breach of fiduciary duty to a degree sufficient to defeat this motion, it is axiomatic that Plaintiffs have likewise pleaded sufficiently the allegations that Defendants were enriched by their actions . . . .  If Plaintiffs succeed on the merits of their breach of fiduciary duty and aiding and abetting claims, it is likely they will also be able to prove that neither Kennedy nor Fort James can retain any benefit resulting from the disputed transaction justifiably or in accordance with the fundamental principles of justice or equity and good conscience." (internal quotation marks omitted)); *cf. NuVasive, Inc. v. Miles*, 2020 WL 5106554, at *12 (Del. Ch. Aug. 31, 2020) ("NuVasive contends that Alphatec's alleged aiding and abetting of Miles's breaches of fiduciary duty constitutes independent wrongfulness sufficient to state a claim for tortious interference with prospective economic advantage.  But, as discussed, . . . NuVasive's aiding and abetting claim does not withstand Alphatec's Motion to Dismiss.  Consequently, because the *only* independent wrongfulness alleged by NuVasive is the aiding and abetting claim, NuVasive has failed to plead independent wrongfulness and its claim for tortious interference with prospective economic advantage is dismissed." (emphasis in original)).

[100] *See In re Molycorp, Inc.*, 2015 WL 3454925, at *11.

[101] Compl. ¶ 175.

or mistake at the time of transfer."[102]  Even for defendants who did not act with scienter, the absence of justification requirement suggests that the defendant must be at least "sufficiently aligned with [the] wrongdoer that [he] ought to disgorge an unearned benefit conferred upon [him] by the wrongdoer at the victim's expense."[103] Where the defendant participated at arm's-length in a negotiated transaction, and the plaintiff has not alleged that the defendant was knowingly complicit in any breach of fiduciary duty, the plaintiff has also failed to allege the defendant was not justified in the enrichment it obtained via that transaction.[104]

In an attempt to circumvent the determination that Ares did not aid and abet any breach, Plaintiff points to the narrow line of cases where an unjust enrichment claim "may exist . . . even if the defendant retaining the benefit is not a wrongdoer."[105]  Plaintiff relies on *Schock v. Nash* to support the contention that Ares should be "deprive[d] . . . of benefits that in equity and good conscience [it] ought not to keep, even though [it] may have received those benefits honestly in the first

---

[102] *In re Lear Corp.*, 967 A.2d at 657 n.73 (quoting *Territory of U.S. V.I. v. Goldman, Sachs & Co.*, 937 A.2d 760, 796 n.161 (Del. Ch. 2007), *aff'd*, 2008 WL 2894840 (Del. July 29, 2008), and citing *Palese v. Del. State Lottery Office*, 2006 WL 1875915, at *5 (Del. Ch. June 29, 2006)).

[103] *Territory of U.S. V.I.*, 937 A.2d at 796 n.161 (quoting *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 672–73 & n.25 (Del. Ch. 2006), and applying this principle over *Schock v. Nash*, 732 A.2d 227, 232 (Del. 1999)).

[104] *See, e.g.*, *In re Lear Corp.*, 967 A.2d at 657.

[105] Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 16.01[b], at 16-14 (2018) (collecting cases).

instance."[106] In *Schock*, our Supreme Court held that "[r]estitution is permitted even when the defendant retaining the benefit is not a wrongdoer."[107] In that case, a fiduciary made "gratuitous transfers" to herself and her family while acting as a power of attorney, and her family assisted in the scheme.[108] The fiduciary titled a brokerage account in the name of herself and her mother to hold the improperly obtained funds.[109] The fiduciary's mother, a defendant, "was not a wrongdoer[:]"[110] she was unaware that those funds were transferred to the account, did not know where the funds came from, and "removed her name from the brokerage account and has not received any benefit from the account."[111] Assessing the propriety of the Court of Chancery's damages determination, the Supreme Court held that the supposedly innocent party can still be unjustly enriched and jointly and severally responsible for restitution damages, as supported by the conclusion that, under the facts of that case, "it would be unconscionable to allow them to retain that benefit."[112]

---

[106] *Schock*, 732 A.2d at 233.

[107] *Id.* at 232 (citing *Fleer Corp.*, 539 A.2d at 1063).

[108] *Id.* at 223.

[109] *Id.* at 232.

[110] *Id.*

[111] *Id.*

[112] *Id.* Recognizing that "[t]he issue of whether the judgment should be modified is not before [the Court]," *id.*, the Court only reviewed the trial court's award of damages,

But in situations like this one, "equity and good conscience" generally have not required depriving an innocent, successful bidder of an arm's length bargain.[113] Indeed, this Court has previously declined to expand *Schock* where the alleged right of recovery is "based solely on the unfairness" of a "passive" party retaining a benefit it received at arm's-length and in good faith.[114] The great weight of authority provides that where a plaintiff has failed to plead that a defendant aided and abetted a breach of fiduciary duty, that failure translates into a failure to plead requisite wrongdoing for an unjust enrichment claim.

Here, as explained, Ares' participation in the transaction was not wrongful, and it had no knowledge that Oaktree's participation was somehow inappropriate. Ares obtained its benefit through arm's-length negotiations.[115] Plaintiff has not pled that Ares' benefit was unjustified. "[F]or the same reasons as the complaint fails to

---

affirming it as "the product of an orderly and logical deductive process and supported by the record." *Id.* at 234.

[113] *See, e.g.*, *In re Lear Corp.*, 967 A.2d at 657; *Territory of U.S. V.I.*, 937 A.2d at 796 n.161; *Jackson Nat. Life Ins. Co.*, 741 A.2d at 394; *see also NuVasive, Inc.*, 2020 WL 5106554, at *12. The Court need not legally adjudicate a wrongdoing in order to uphold an unjust enrichment claim. *See, e.g.*, *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *43 (Del. Ch. Apr. 14, 2017). The wrongdoing may be exculpated or otherwise excused by an available defense, but the enrichment nonetheless lacks justification under the facts of the case. *Id.* "Under those circumstances, unjust enrichment could provide a vehicle for the [plaintiff's] recovery." *Id.*

[114] *Territory of U.S. V.I.*, 937 A.2d at 796 n.161.

[115] This conclusion, based on Plaintiff's allegations about Ares' negotiations, is not intended to extend to the allegations about the other defendants or their negotiations.

plead facts supporting an inference that [Ares] was knowingly complicit in any breach of fiduciary duty, it also fails to support an inference that [Ares] was engaged in some form of wrongdoing" that supports an unjust enrichment claim.[116] Count V is dismissed as to Ares.

## III.  CONCLUSION

The Motion is GRANTED and the Complaint is hereby dismissed with prejudice as to Ares.  The parties shall submit an implementing order within twenty days of this decision.

---

[116] *In re Lear Corp.*, 967 A.2d at 657.